IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY K. REESE & MARY K. REESE | : | CIVIL ACTION |
| | : | NO. 09-2948 |
| v. | : | |
| | : | |
| FORD MOTOR COMPANY & | : | |
| FAULKNER-CIOCCA FORD MERCURY | : | |

_____

| | | |
|---|---|---|
| TIMOTHY K. REESE & MARY K. REESE | : | CIVIL ACTION |
| | : | NO. 10-1181 |
| v. | : | |
| | : | |
| MAGARINO FORD-MERCURY, INC. | : | |

O'NEILL, J.                                                                                          October 3, 2011

MEMORANDUM

      I have before me motions for summary judgment by defendants Ford Motor Company ("Ford"), Faulkner-Ciocca Ford Mercury ("Faulkner") and Magarino Ford-Mercury, Inc. ("Magarino"). Ford also requests attorney fees. Plaintiffs Timothy and Mary Reese oppose each motion. For the reasons that follow, I will grant defendants' motions for summary judgment but deny Ford's request for fees.

BACKGROUND

      In 2006, the Reeses decided to purchase a new, fully-loaded Mercury Monterey. Doc. 43-4 at p. 7.[1] They placed an order with Faulkner, whose inventory at the time did not include a car that met the Reeses' specifications. Doc. 43-7 at p. 3. Magarino's inventory, however, did. Doc. 43-6 at p. 14. Accordingly, Faulkner and Magarino arranged a swap wherein Faulkner

---

[1]References to the record will be to the document number and pagination generated by the electronic case filing system on the top of each page of the documents filed by the parties.

acquired a fully-loaded Monterey from Magarino in exchange for another vehicle.  Id.  The Reeses then purchased the Monterey from Faulkner.  Doc. 43-8 at p. 14.  When the Reeses acquired the vehicle, it had 129 miles on it.  Doc. 43-7 at p. 5.  The Monterey came with a new vehicle limited warranty which stated that the warranty did not cover damages caused by the installation of a non-Ford part.  Doc. 39-12 at p. 13.  Plaintiffs also purchased an extended warranty that extended the warranty coverage to seventy-two months, which was the length of the loan plaintiffs took to pay for the car.[2]  Doc. 43-8 at p. 22.

Timothy Reese is a Pep Boys store manager.  Doc. 43-4 at p. 6.  He lacks training in vehicle maintenance and repair and does not service vehicles that come in to Pep Boys.  Id.  He does, however, perform routine work on his own cars, including oil changes, tire rotations, and changing batteries.  Id.  When the Reeses acquired the Monterey, Timothy Reese inspected the vehicle and found that it met his specifications.  Doc. 39-9 at p. 3.  He testified that he would have noticed if the car included aftermarket parts, and that he did not see any such parts in the course of his inspection.  Id.

Plaintiffs had the Monterey for approximately three years and 33,000 miles.  Doc. 39-5 at p. 5.  During that time, Timothy Reese performed oil changes, filter changes, and tire rotations on the vehicle.  Doc. 43-4 at p. 7.  He also brought the Monterey in to Pep Boys for two state inspections and a fuel filter change.  Id. at p. 8.  Reese testified that the vehicle required no further maintenance or repair.  Id. at p. 9.

One evening in May of 2009, Timothy Reese drove the Monterey home and parked it in

---

[2]The parties have not provided a copy of the extended warranty.  I will assume that the extended warranty does not alter the new vehicle limited warranty's provision that disclaims coverage for damages caused by aftermarket parts.

his garage. Doc. 43-4 at p. 9. As he exited the vehicle, Reese smelled a burning odor but did not notice any smoke or flames coming out of the car. Id. at p. 10. He proceeded into his house and started to eat dinner with his wife. Id. at p. 12. Shortly thereafter, the Reeses both smelled a burning odor coming from the garage. Id. Timothy Reese opened the door to the garage and saw flames emerging from the front driver's-side corner of the Monterey. Id. The fire spread and damaged the Reeses' property. Id. at p. 15-16.

The Reeses subsequently sued Ford and Faulkner (Civil Action No. 09-2948), asserting claims for breach of warranty, breach of contract, strict liability and negligence. When plaintiffs learned through discovery that Faulkner acquired the Monterey from Magarino, the Reeses brought a separate action against Magarino asserting claims for breach of warranty, strict liability and negligence (Civil Action No. 10-1181). The Magarino suit was then consolidated with the action against Ford and Faulkner.[3]

The Reeses have retained forensic mechanic Victor Donatelli as an expert. He opined that the fire started in the area of aftermarket wiring connected to the Monterey's engine cooling fan resistor. Doc. 45-10 at p. 4. Donatelli testified at his deposition that Ford would not have built the Monterey with the aftermarket wiring and that the vehicle would not have left Ford's possession with the aftermarket wiring. Doc. 39-6 at p. 4. Donatelli also observed that the vehicle's power steering cooler showed signs of damage suggesting the car had been in a crash. Doc. 45-10 at p. 6.

Donatelli further testified at his deposition that earlier in his career, when he was a

---

[3]Magarino subsequently filed a third-party complaint against Pep Boys, but that action was dismissed with prejudice pursuant to a stipulation of the parties.

mechanic at an automobile dealership, he was occasionally asked to repair vehicles that became damaged while in the dealership's possession.  Doc. 43-14 at p. 3.  Donatelli observed that those repairs would not be documented.  Id. at p. 4.  Donatelli testified that he did not, however, ever use aftermarket parts to make such repairs.  Id.

Ford's experts, fire investigator Larry Helton and design analysis engineer James J. Engle, also conclude that the fire originated in an area of the engine compartment that included aftermarket wiring.  Doc. 43-13 at p. 3; Doc. 39-7 at p. 3.  Faulkner and Magarino have jointly retained a mechanical engineer and certified fire and explosion investigator who opines that the cause of the fire was undetermined.  Doc. 43-15 at p. 7.  In their motions for summary judgment, however, Faulkner and Magarino take the position that aftermarket wiring caused the fire.  Doc. 38-1 at p. 2; Doc. 29-1 at p. 2.

The record contains no evidence showing who installed the aftermarket wiring.  Similarly, the Monterey's maintenance records show no sign that the vehicle was ever involved in a collision.

## STANDARD OF REVIEW

Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party moving for summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23.  If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute.  See Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  A fact is "material" if it might affect the outcome of the case under governing law.  Id.

To establish "that a fact cannot be or is genuinely disputed," a party must:

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

## DISCUSSION

I.     Motions for Summary Judgment

A.     Strict Liability

The parties agree that Pennsylvania law governs the Reeses' strict liability claims.  Pennsylvania has adopted Restatement (Second) of Torts § 402A (1965).  See Webb v. Zern, 220 A.2d 853, 854 (Pa. 1966).  Section 402A provides that

5

> (1) [o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
>> (a) the seller is engaged in the business of selling such a product, and
>>
>> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
>> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>>
>> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402A (1965). A plaintiff in a strict liability case "must prove (1) that the product was defective, (2) that the defect existed when it left the hands of the defendant, and (3) that the defect caused the harm." Schindler v. Sofamor, Inc., 774 A.2d 765, 771 (Pa. Super. Ct. 2001). "The seller is not liable if a safe product is made unsafe by subsequent changes." Davis v. Berwind Corp., 690 A.2d 186, 190 (Pa. 1997).

In the present matter, the parties agree that aftermarket wiring caused the fire, but the record contains no evidence showing who installed these wires. Between the Monterey's manufacture and its demise, five entities exercised control over the vehicle: Ford, Magarino, Faulkner, the Reeses and Pep Boys. Even if the jury were to accept plaintiffs' assertion that neither plaintiffs nor Pep Boys installed the aftermarket wiring, the jury would have no way of knowing who among the three defendants, if any, is liable. In other words, there is no evidence

that the Monterey was defective "when it left the hands of" any defendant.  Schindler, 774 A.2d at 771.  Summary judgment is appropriate because plaintiffs cannot prove this element of their strict liability claims.

The Pennsylvania Superior Court's decision in Pennfield Corp. v. Meadow Valley Elec., Inc., 604 A.2d 1082 (Pa. Super. Ct. 1992) is instructive.  In that case, hundreds of pigs died when the ventilation system in their shelter malfunctioned.  Id. at 1083.  The pigs' owner sued Meadow Valley Electric, the company that performed maintenance of the shelter's electrical system.  Id.  Meadow Valley, in turn, attempted to join two additional defendants, one of whom allegedly distributed a defective cable that caused the ventilation system to fail.  Id.  Meadow Valley's joinder complaint asserted claims of strict liability, negligence, and breach of warranty.  Id.  But the complaint did not identify which of the two companies actually distributed the faulty cable.  Instead, the complaint alleged that "either" one company or the other supplied the part.  Id.  One of the distributors objected in the form of a demurrer to being joined.  Id.  The trial court sustained the objection and dismissed the joined company from the suit.  Id. at 1084.

On appeal, Meadow Valley argued that it need not allege that a particular company distributed the defective cable because the "alternative liability" theory relieved it of its burden of proving which distributor caused the damages.  Id. at 1085.  See Restatement (Second) of Torts § 433B(3) (1965) ("Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.").  The Superior Court noted that in cases applying the alternative liability theory all defendants acted negligently even if only one caused the harm.  Id. at 1086-87.  The Court declined to extend the

alternative liability theory to the case before it because the joinder complaint alleged that only one distributor supplied the defective cable.  The Court explained that a contrary decision

> would potentially open a Pandora's box of wide-open liability, where an innocent party could be found liable to an injured party just because he cannot disprove that he caused the accident. . . . Our system of jurisprudence rightly balks at assigning liability to a innocent party.  Our reluctance has been overcome only when compelling circumstances demand that we deviate from the rule that a cause of action must fail unless defendant's conduct is shown to have been the proximate cause of plaintiff's injury.

Id. at 1088 (emphasis in original).  The Court remanded the case to allow Meadow Valley to amend its joinder complaint, but cautioned that "if after an opportunity to submit all the relevant evidence, the probabilities are at best still evenly divided between the [joined defendants] as to causation, it would be the duty of the trial court to dismiss the complaint at an appropriate dispositional stage in the proceedings upon motion by either or both."  Id. at 1090.

In the present matter, discovery has concluded and the Reeses cannot point to any evidence showing who among the three defendants installed the aftermarket wiring.  Although plaintiffs do not expressly rely on an alternative liability theory, they nonetheless argue that their claims should survive summary judgment because a factfinder could decide that one of the defendants installed the aftermarket wiring.  Notably, plaintiffs' briefs opposing defendants' motions for summary judgment each contain an identical statement arguing that a factfinder could draw the inference that the Monterey's "accident damage was subject to a corrective repair by one of the Defendants."  See Doc. 43-2 at p. 14; Doc. 44 at p. 13; Doc. 45 at p. 13 (emphasis added).  Only one defendant could have installed the aftermarket wiring and plaintiffs cannot show that one defendant was more likely than the others to have done so.  If this case went to

trial, the factfinder could only hazard a guess as to which defendant was liable. Because plaintiffs cannot prove an element of their strict liability claims–that the vehicle left a defendant's control in a defective condition–I must grant the defendants' motions for summary judgment on these claims.

Plaintiffs' arguments to the contrary are unavailing. They cite to Cornell Drilling Co. v. Ford Motor Co., 359 A.2d 822 (Pa. Super. Ct. 1976) (disapproved of on other grounds by REM Coal Co. v. Clark Equip. Co., 563 A.2d 128 (Pa. Super. Ct. 1989)) for the proposition that "[a]lthough it is helpful for a plaintiff to have direct evidence of the defective condition which caused the injury or expert testimony to point to that specific defect, such evidence is not essential in a strict liability case based on s 402A." Id. at 825. I do not doubt the soundness of this principle, but it has no bearing on the present case because the parties have presented "direct evidence" of the cause of the fire: the aftermarket wiring. The issue for which there is no evidence is the identity of the responsible party. Absent such evidence, plaintiffs' strict liability claims cannot survive summary judgment.

I write further to address issues particularly affecting the Reeses' strict liability claim against Ford. The Reeses' own expert, Victor Donatelli, testified that the Monterey would not have left Ford's possession with aftermarket wiring. Doc. 39-6 at p. 4. The Reeses attempt to overcome this testimony by arguing that the installation of aftermarket wiring was foreseeable. Plaintiffs correctly note that "[w]here the product has reached the user or consumer with substantial change, the question becomes whether the manufacturer could have reasonably expected or foreseen such an alteration of its product." Davis, 690 A.2d at 190. But the record contains no evidence suggesting that Ford should have foreseen the installation of aftermarket

9

wiring by one of its authorized dealers. Donatelli testified that when he was a mechanic at another manufacturer's dealership, he made undocumented repairs to vehicles, but he also testified that he never used aftermarket parts. Doc. 45-14 at p. 4. Based on the record evidence, Ford could not have foreseen the alterations that were made to the Reese's vehicle.

Plaintiffs also argue that Ford is made strictly liable simply by putting the Ford name on the Monterey. The Reeses cite to Brandimarti v. Caterpillar Tractor Co., 527 A.2d 134 (Pa. Super. Ct. 1987), in which a forklift that Caterpillar did not manufacture injured the plaintiff. Id. at 135. The forklift did, however, display the Caterpillar name. Id. at 139. The Court concluded "that Caterpillar, who although not the manufacturer, authorized the defendant manufacturer to display its name on the product, could be held strictly liable if the product bearing the Caterpillar name proved defective and the defect caused Appellant's injuries." Id. at 140.

Brandimarti is distinguishable because that case did not involve a product that was modified after it left the manufacturer's control. Well-settled Pennsylvania law provides that a seller is not strictly liable where damages result from an unforseeable change to its product. See Hoffman v. Niagra Mach. & Tool Works Co., 683 F. Supp. 489, 493 (E.D. Pa. 1988) (applying Pennsylvania law and explaining that "a manufacturer may be relieved of liability only if: (1) the product was substantially altered after it left the manufacturer's control; (2) the modifications were not foreseeable to the manufacturer; and (3) the changes to the product were a superseding cause of the user's injury"). There being no evidence that the installation of aftermarket wiring was foreseeable, Ford is entitled to summary judgment on the Reeses' strict liability claim.

B.      Negligence

Plaintiffs' inability to identify a defendant that is responsible for installing the aftermarket

wiring also dooms their negligence claims. The Pennsylvania Supreme Court has explained that

> [t]he elements necessary to plead an action in negligence are: (1) the existence of a duty or obligation recognized by law, requiring the actor to conform to a certain standard of conduct; (2) a failure on the part of the defendant to conform to that duty, or a breach thereof; (3) a causal connection between the defendant's breach and the resulting injury; and (4) actual loss or damage suffered by the complainant.

Atcovitz v. Gulph Mills Tennis Club, Inc., 812 A.2d 1218, 1222 (Pa. 2002). Because plaintiffs have no evidence as to who installed the aftermarket wiring, plaintiffs cannot establish that any defendant breached a duty to plaintiffs or caused plaintiffs' injuries. Accordingly, plaintiffs' negligence claims cannot survive summary judgment. See Pennfield Corp., 604 A.2d at 1090 (noting that a complaint that included negligence claim should be dismissed if evidence failed to show which of two potentially liable defendants caused damages).

C.      Breach of Warranty and Breach of Contract

Plaintiffs assert claims of breach of implied warranty against all defendants. But these claims fail for the same reason that the strict liability and negligence claims fail: plaintiffs cannot point to any evidence that any particular defendant installed the aftermarket wiring. Accordingly, plaintiffs cannot prove that any defendant breached an implied warranty. See id. (noting that complaint that included breach of warranty claim should be dismissed if evidence did not show which of two potentially defendants caused damages).

Against Ford, plaintiffs also allege breach of express warranty. This claim fails because Ford's warranty disclaims coverage for damages resulting from the installation of aftermarket parts. See Doc. 39-12 at p. 13. The Reeses maintain that equitable estoppel should prevent Ford from relying on this provision of the warranty. "Equitable estoppel is a doctrine that prevents

one from doing an act differently than the manner in which another was induced by word or deed to expect." Novelty Knitting Mills, Inc. v. Siskind, 457 A.2d 502, 503 (Pa. 1983). The doctrine does not apply here. Even if I accept that Ford "induced" the Reeses into believing that they were purchasing a Monterey consisting entirely of Ford parts, plaintiffs have no evidence that Ford "act[ed] differently" by selling the Reeses a car that included aftermarket parts. On the contrary, plaintiffs' own expert, Victor Donatelli, testified that Ford would not have installed aftermarket parts on the Reeses' Monterey. Accordingly, I will dismiss plaintiffs' breach of warranty claims.

Finally, I will dismiss plaintiffs' breach of contract claims because the Reeses cannot show that any defendant committed a breach by installing aftermarket wires.

II.     Request for Attorney Fees

Pennsylvania law authorizes the award of counsel fees "as a sanction against another participant for dilatory, obdurate or vexatious conduct during the pendency of a matter," 42 Pa. Cons. Stat. § 2503(7), and where "the conduct of another party in commencing the matter or otherwise was arbitrary, vexatious or in bad faith." Id. § 2503(9). Ford asks me to award fees because plaintiffs refused to dismiss Ford after it became clear through discovery that Ford did not manufacture or install the wiring that caused the fire.

While plaintiffs' case is not strong enough to survive summary judgment, I do not believe plaintiffs acted vexatiously or in bad faith in maintaining their action against Ford. Plaintiffs presented colorable arguments that Ford could be liable despite the fact that aftermarket parts caused the Monterey to catch fire. Accordingly, I will deny Ford's request for attorney fees.

An appropriate Order follows.